Accordingly, **IT IS HEREBY ORDERED** that Kodak's motion for reconsideration is denied.

**IT IS FURTHER ORDERED** that Kodak's motion for certification for interlocutory appeal is denied.

**Bruce and Ila HUNT, on behalf of themselves and as next friends of Jerry Wayne HUNT, Plaintiffs,**

v.

**Robert E. BARTMAN, Missouri Commissioner of Education, John F. Allan, Assistant Commissioner for Special Education, Missouri Department of Elementary and Secondary Education, and Missouri State Board of Education, Defendants.**

No. 91–6067–CV–SJ–8.

United States District Court, W.D. Missouri, · St. Joseph Division.

Dec. 4, 1994.

Samara N. Klein, Missouri Protection and Advocacy Services, Kansas City, MO, Kenneth M. Chackes, St. Louis, MO, Michael H. Finkelstein, Jefferson City, MO, for plaintiff.

Edwin H. Steinmann, Jr., Missouri Atty. General's Office, Jefferson City, MO, James W. Whan, Maryville, MO, for defendants.

## ORDER

STEVENS, Chief Judge.

On behalf of themselves and their eleven-year-old developmentally delayed son Jerry, plaintiffs Bruce and Ila Hunt ("plaintiffs" or the "Hunts") bring this action challenging the procedures by which local and state education officials refer children to and place them in the Missouri State Schools for the Severely Handicapped (the "State Schools").

The defendants originally fell into two groups, the "School District Defendants" and "the State Defendants." The first group, the "School District Defendants," was made up of the Maryville School District, Dr. Roland Tullberg in his official capacity as Superintendent of the Maryville School District, and the six members of the Maryville School Board, in their official capacities. However, plaintiffs' claims against the School District Defendants were temporarily abated pursuant to a March 18, 1992 consent decree, pursuant to which the School District Defendants have been required to educate Jerry in the Maryville School District until the end of the 1993–94 school year. Thus, at the time of trial, plaintiffs' only remaining claims were against the other group, the "State Defendants," which includes the Missouri State Board of Education; the Missouri Department of Elementary and Secondary Education ("DESE"); Robert E. Bartman, in his official capacity as Missouri Commissioner of Education; and John F. Allan, in his official capacity as Assistant Commissioner of the DESE.

Plaintiffs claim that the procedures established by the State Defendants and used to refer and re-refer Jerry to, and to place Jerry in, the State School in St. Joseph, Missouri violate various federal statutory and constitutional provisions. In particular, plaintiffs contend that the State Defendants' referral and placement procedures violate the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1401 *et seq.* ("IDEA") (formerly known as the Education for All Handicapped Children Act or "EHA") and its accompanying regulations; section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and its accompanying regulations; the provisions of the Americans with Disabilities Act,

42 U.S.C. §§ 12101 *et seq.* ("ADA"), and its accompanying regulations; the due process and equal protection clauses of the Fourteenth Amendment to the United States Constitution; and 42 U.S.C. § 1983. The court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

The court has examined the pleadings, heard and reviewed the evidence, and considered the parties' post-trial briefing. For the reasons set forth below, the court finds in favor of plaintiffs and against the State Defendants. Judgment shall be entered accordingly. The findings and conclusions of the court are set forth below.

### I. Facts

#### A. Legal Background

Pursuant to statute, the Missouri State Board of Education has established State Schools to provide educational services for "severely handicapped children" whose local school districts do not operate appropriate special education services. Mo.Ann.Stat. § 162.730.1 (Vernon Supp.1994); *see also* Pl.'s Ex. 30, App. B, at B–4 ("Fiscal Year 1992–1994 State Plan for Part B of the Individuals with Disabilities in Education Act") (hereinafter "State Plan").[1] The State Schools serve approximately 1,700 students, giving them with "a community-based day school educational program providing appropriate instruction in the areas of self-care, sensory motor [skills], language and communication, interpersonal relations, arithmetic, fine arts, and practical arts and occupational skills." Id. at 89; Tr. at 52 (Heskett testimony).[2]

To be eligible for placement in the State Schools, a child must fall within the definition of "severely handicapped," which requires a determination (1) that the child's performance on standardized instruments measuring intelligence and other facets of develop-

ment is at a level "less than one-half of normal students of equivalent age and ethnic-cultural background," State Plan, App. B, at B–1, and (2) that the child is "unable to benefit from or meaningfully participate in" local public school programs because of the extent of a "handicapping condition or conditions," Mo.Ann.Stat. § 162.675(3) (Vernon 1991); see also Tr. at 9 (Cossey testimony);[3] Tr. at 61 (Heskett testimony).

Under Missouri's procedural framework, placement of a child in the State Schools is a multistage process:

#### 1. *Initial Evaluation and IEP Development*

In the first stage, the child's local school district must compile multidisciplinary diagnostic information about the child including, among other things, all relevant medical information as well as measures of the child's intelligence, development, and communication skills according to standardized tests and observation. State Plan, App. B, at B–2 & B–3.

The local school district then formulates an Individualized Education Program ("IEP") for the child. *Id.* at B–3. A child's IEP is developed by a team that includes the child's parent(s), teacher(s), a representative other than the teacher who is "qualified to provide and supervise the provision of special education" (e.g., a building principal or the local school district's coordinator of special education), and other professionals connected with the child's education. 20 U.S.C. § 1401(a)(20); State Plan, App. A, at A–41. Through discussion, the IEP team determines the child's present level of educational performance, establishes educational goals for the child, and identifies the criteria and evaluation procedures to be used to assess whether the child is achieving his or her goals. *Id.* The IEP team then determines how best to meet the child's educational ob-

---

1. IDEA requires participating states to develop and file with the federal government a plan setting forth the state's policies and procedures for assuring compliance with the Act. *See* 20 U.S.C. § 1412(2). Appendix B of Missouri's State Plan relates to the Missouri State Schools for the Severely Handicapped.

2. Dr. John Heskett is the DESE's Coordinator of Special Education Programs and is responsible for the overall supervision of special education services in Missouri.

3. DeWayne Cossey is the Superintendent of the State Schools and an employee of the DESE.

jectives and decides on the services that will be necessary to accomplish them. *Id.* The team memorializes its work in the IEP itself, which is a written statement setting forth the child's present level of educational performance, goals and objectives for the child, evaluation criteria and procedures, and the educational services that will be provided to the child, specifying the extent to which the child will participate in regular educational programs and the amount of "special education services/related services" that will be needed. 20 U.S.C. § 1401(a)(20); State Plan, App. A, at A–42; *see also Honig v. Doe,* 484 U.S. 305, 309–13, 108 S.Ct. 592, 597–98, 98 L.Ed.2d 686 (1988) (discussing IEPs).

It should be noted that, while the IEP committee decides the day-to-day educational program that a child will follow, the committee does not at this stage determine the particular "placement" in which that program will be implemented. Tr. at 66–67 (Heskett testimony). In fact, the State Plan explicitly instructs local school districts that the child's IEP should describe the child's "educational and programmatic needs," but "should not specify placement." State Plan, App. B, at B–3.

The term "placement" refers to the environment in which a child's IEP will be implemented. IDEA requires states to ensure that a continuum of alternative placements are available, including "instruction in regular classes, special classes, [and] special schools," and to "[m]ake provision for supplementary services (such as resource room or itinerant instruction) to be provided in conjunction with regular class placement." 34 C.F.R. § 300.551; *id.* § 300.552(b). This required continuum of alternative placements is a product of IDEA's "mainstreaming" or "least restrictive environment" requirement. *See* 20 U.S.C. § 1412(5)(B).[4]

In compliance with IDEA, the State Plan requires each school district to maintain a continuum of placement options. *See* State Plan, Part VII, at 47. Under the State Plan, placement options include, among other things, regular classroom instruction with modifications in the environment (*e.g.,* curricular adaptations, assistance by a specially trained professional or paraprofessional), self-contained classrooms for students with such severe disabilities that they require "special education instruction on a majority of academic instruction," and "separate schools" (which presumably includes the State Schools). *Id.; id.,* App. A, at A–66 through A–75.

### 2. *The Eligibility Determination*

According to the State Plan, "When the IEP indicates the student is in need of services which the local district is unable to provide and which may be provided by the State Schools for [the] Severely Handicapped," the local school district may forward the multidisciplinary diagnostic information and IEP to the State Schools to determine whether the child is eligible for service in the State Schools. *Id.,* App. B., at B–3; *see also* Tr. at 65–66 (Heskett testimony).

As noted above, a child is eligible for placement in the State Schools if he or she falls within the definition of "severely handicapped," which means: (1) that the child is functioning at levels of development that are one-half or less those of his or her peers, State Plan, App. B, at B–1, and (2) that the child is "unable to benefit from or meaningfully participate in" local public school programs. Mo.Ann.Stat. § 162.675(3).

To make a determination with respect to the first half of the definition of "severely handicapped," the State Schools simply examine the child's diagnostic information to see whether the child's intelligence, communication abilities, and other developmental skills (as measured by standardized diagnostic instruments) are at a level one-half or less than those of his or her peers. Tr. at 61 (Heskett testimony).

With respect to the second half of the definition of "severely handicapped," the State Schools do not require the local school district to document or articulate specifically why the child is "unable to benefit from or

---

4. IDEA's least restrictive environment requirement is discussed in more detail in Section

II(B)(2)(a) of this order.

meaningfully participate in" local school district programs. Tr. at 14–17 (Cossey testimony). The State Schools also do not ask the local district to describe what special education services the local district has in place. *Id.* Instead, at the eligibility review stage of the process, the State Schools rely mainly on the local IEP committee's determination that the child is "unable to benefit from or meaningfully participate in" programs provided by the local school district. *Id.* at 17 & 20; *see also id.* at 61–62 (Heskett testimony).

The State Schools examine the diagnostic information and IEP submitted by the child's local school district. *Id.* If this material raises questions (*e.g.,* the IEP calls for things that generally aren't required by similarly situated children or that don't seem to be supported by the diagnostic information), the State Schools send the request for an eligibility determination back to the local school district. *Id.* at 62, 64–65.

### 3. Referral

If the State Schools determine that a child is "severely handicapped," the State Schools notify the local school district that the child is eligible for service in the State Schools. State Plan, App. B, at B–4. "Such notice shall, to the extent possible, include the nature and location of such services." *Id.*

Once notified that a child is eligible for education in the State Schools, the local school district must decide whether to refer the child to the State Schools. According to the State Plan, the local school district may refer an eligible child to the State Schools if the local district is "unable to otherwise provide special education services." *Id.* Heskett testified that simply because a child is eligible does not mean the child will be referred to the State Schools. *See* Tr. at 65, 66–68, 71–73 (Heskett testimony). Instead, by seeking an eligibility determination, the local school district is merely asking whether placement in the State Schools is an option for implementing the child's IEP. *Id.* at 72–73.

Heskett further testified that when a local district is notified that the child is eligible for the State Schools, the district is supposed to reconvene the IEP committee. *Id.* at 65, 66–69. The IEP committee is then supposed to consider the range of alternative placements available to the child and make a decision as to the child's placement. *Id.* at 66–69. It is at this stage that the local school district is to consider whether supplementary aids and/or services could be used to implement the child's IEP in a local school program. *Id.* at 70 & 82. If the IEP committee decides that the State Schools represent the most appropriate and least restrictive placement for the child, the local school district submits a Letter of Referral formally referring the child to the State Schools. *Id.* at 68; *see also* State Plan, App. B., at B–4. The standardized Letter of Referral specifically requires the signator (in the instant case, Dr. Tullberg) to "certify that the placement alternatives associated with local school district ... educational programming have been considered by the multi-disciplinary diagnostic team and rejected." *See, e.g.,* Def.'s Ex. 98.

In view of Heskett's detailed and credible testimony, there appear to be a few gaps in the State Plan. For instance, the State Plan does not explicitly instruct local school districts that, prior to referring a child to the State Schools, local districts should consider the range of available placements and whether supplementary aids and/or services could be used to implement the child's IEP in a local school program. *See* State Plan, App. B, at B–4; Tr. at 69–70 (Heskett testimony).

In addition, the State Plan does not expressly instruct local school districts to reconvene the IEP committee prior to referral. *See* State Plan, App. B, at B–4; Tr. at 69–70. In fact, the State Plan does not specifically designate anyone to make the decision to refer a child to the State Schools. Some portions of the State Plan, and Jerry's IEPs in the instant case, strongly suggest that the IEP committee makes the referral decision. *See* State Plan, Part VIII, at 57 (requiring that the participation of individuals who help make the placement decision be documented on the IEP); Pls.' Ex. 22 (1988–89 IEP for Jerry Hunt, which includes a recommendation that Jerry be placed in the State Schools); Def.'s Ex. 91 (1989–90 IEP for Jerry Hunt, which includes a recommenda-

tion that Jerry be placed in the State Schools). However, the certification language in the standardized Letter of Referral indicates that the referral decision is made by the multidisciplinary diagnostic team. Def.'s Ex. 98 (Letter of Referral for the 1991–92 school year) (requiring the signator to certify that placement alternatives in the local school district have been considered and rejected by the "multi-disciplinary diagnostic team"). Moreover, in the instant case, the diagnostic team that performed Jerry's three-year evaluation in 1991 included in their report a "determin[ation] that Jerry Hunt's needs can best be served with continued placement in the State School for the Severely Handicapped." Pls.' Ex. 12 at 6. Unlike the IEP committee, a diagnostic team does not necessarily include a child's parents. Tr. at 78 (Heskett testimony). Thus, if referral decisions are made by multidisciplinary diagnostic teams, as the standardized Letter of Referral suggests, a referral decision in fact may be made without consulting the child's parents. The State Plan further suggests that this may occur by providing that, if the local district makes a referral, "[n]otice of such decision to refer shall be given to the parent/legal guardian." State Plan, App. B, at B–4.

When the above-noted portions of Appendix B of the State Plan were brought to Heskett's attention, he testified that he may have misspoken about reconvening the IEP committee after the local school district is notified that a child is eligible for the State Schools. Tr. at 69 (Heskett testimony). Heskett also testified that it "could very well be" that local school districts make referral decisions without meeting with a child's parents, but "most school districts meet with the parent and talk about [referral to the State Schools] before they make that referral." Id. at 69–70.

Based on the foregoing evidence, the court finds: (1) that the State Plan does not explicitly instruct local school districts that have been notified that a child is eligible for service in the State Schools precisely which actors—the IEP committee or the multidisciplinary diagnostic team—are to make the referral decision; (2) that the State Plan

does not explicitly instruct local school districts that have been notified that a child is eligible for service in the State Schools that, prior to referral, the school district must consider the range of alternative placements, including whether the child's IEP could be implemented in a local school district program with the use of supplementary aids and services; and (3) that local school districts may confer with a child's parents in determining whether the child should be referred to the State Schools, but are not required to consult with parents by the State Plan.

Finally, the court finds that, from the evidence before it, a local school district documents the reasons for making a referral in two places: (1) the standardized Letter of Referral, which contains a boilerplate clause certifying that the multidisciplinary team has considered and rejected placement alternatives; and (2) the child's IEP, which includes a section entitled "Justification for Placement." The court further notes that, in the instant case, the Maryville School District may have attempted to document the reasons for its referral in the multidisciplinary diagnostic summary, which included a determination by the diagnostic team that Jerry's needs could best be served in the State Schools. See Pls.' Ex. 12.

### 4. Placement, Review, and Re-referral

A referral constitutes a placement decision by the local school district (i.e., to have the child educated in the State Schools). After receiving the Letter of Referral, the State Schools make their own placement decision. State Plan, App. B, at B–4. At this stage, there are three placement options: a State School; a not-for-profit private agency; or, for students with serious health impairments, homebound services. Id.

Within thirty days after the child is enrolled in the State Schools, an additional IEP conference is held with the child's parent(s), State School staff members, and a representative of the local school district that made the referral. Id. "The purpose of this review is to confirm the eligibility and appropriateness of the student's continued enrollment in the State Schools...." Id. Heskett testified that the thirty-day post-placement

review is the first point at which the State School is able to consider whether the child has been placed in the least restrictive environment or whether the child could be educated in a local school district program with the use of supplementary aids or services. Tr. at 83–84 (Heskett testimony). If the State School determines that the child could be educated in a less restrictive environment, the referral is rejected and the child is sent back to his or her local school district. *Id.* at 84; *see also* State Plan, App. B, at B–5.

If a child has been educated in the State Schools for a year or more, the State School convenes the IEP committee to develop the child's IEP for the following school year. Tr. at 21 (Cossey testimony); State Plan, App. B, at B–5. Personnel from the referring local school district are "invited," but not required, to participate in the development of the child's IEP. *Id.; see also* Tr. at 21. After going through the IEP process outlined in Section I(A)(1) of this order, the committee makes a recommendation as to whether continued placement in the State Schools is most appropriate for the child or whether the child should be placed in the local school district. Tr. at 22 (Cossey testimony); id. at 84 (Heskett testimony). If, after reviewing the child's IEP, "the local school district determines a continuing need for services from the State Schools," the local district re-refers the child to the State Schools by having the superintendent sign and return a Letter of Referral to the State Schools. State Plan, App. B, at B–5. As was the case with initial referrals, discussed above, neither the State Plan nor the evidence indicates precisely who in the local district makes the decision to re-refer the child to the State Schools. The testimony of Cossey and Heskett, and Jerry's IEPs, indicate that the IEP committee, which may include "[p]ersonnel from the referring district," *id.*, makes a recommendation as to whether the child should be re-referred to the State Schools. However, this does not answer the question of which actor(s) in the local district make the decision to re-refer. As noted above, the Standardized Letter of Referral indicates that the multi-disciplinary diagnostic team makes the decision, *see, e.g.,* Def.'s Ex. 98, although it appears likely that

the referral decision is made by the superintendent of the local school district acting on the recommendation of the IEP committee.

Every three years, the local school district is required to conduct another round of multi-disciplinary diagnostic tests. Heskett testified that, through the annual IEP process, there is movement of students from the State School back to local school districts. Tr. at 84 (Heskett testimony).

### 5. *Hearing Rights*

Under IDEA, parents of disabled children enjoy a number of procedural safeguards. *See* 20 U.S.C. § 1415. Such safeguards include the right to inspect all relevant records with respect to their child's identification, evaluation, or placement, and the right to prior written notice when an agency seeks or refuses to seek to change a child's identification, evaluation, or placement. *See id.* § 1415(b)(1)(A) & (C).

In addition, IDEA grants parents "an opportunity to present complaints with respect to any matter relating to the identification, evaluation, or educational placement of the child." *Id.* § 1415(b)(1)(E). Whenever parents present such a complaint, IDEA entitles them to "an impartial due process hearing which shall be conducted by the State educational agency or by the local educational agency or intermediate educational unit, as determined by State law or by the State educational agency." *Id.* § 1415(b)(2).

If the due process hearing is conducted by a local educational agency or an intermediate educational unit, a party aggrieved by the decision may seek an impartial review of the decision by the state educational agency. *Id.* § 1415(c). A party aggrieved by a decision issued after a hearing or review conducted by the state educational agency may appeal the decision by filing a civil action in federal court. *Id.* § 1415(e).

The State of Missouri has implemented these provisions in its statutes and Part VI of the State Plan. *See* State Plan, Part VI, at 27–36; *see also* Mo.Ann.Stat. §§ 162.961–963. The first level of "due process" is an informal "administrative review," which is conducted by the school district's chief administrative

officer or a designee. *Id.* § 162.961.1; State Plan, Part VI, at 32.

If the parents disagree with the decision at the "administrative review" level, they may appeal that decision to a "local-level hearing panel,"[5] which consists of three impartial individuals who are knowledgeable about the child's handicapped condition. *Id.;* Mo.Ann. Stat. § 162.961.2. Proceedings at this stage are formal: parties have the right to be accompanied by counsel and to compel the attendance of witnesses; a record may be made; and the three-member panel issues its decision in the form of written findings. State Plan, Part VI, at 33; Mo.Ann.Stat. §§ 162.961.4–5, 162.963.

Appeal of a decision of a local level hearing panel is to a state level review officer designated by the State Board of Education. State Plan, Part VI, at 33; Mo.Ann.Stat. § 162.962. Upon reviewing the entire record, the state level review officer issues a written decision either affirming or reversing the decision of the local hearing level. State Plan, Part VI, at 33–34. Further appeal is to the courts. *Id.* at 35.

Finally, the court notes that the initiation of review proceedings under IDEA and Missouri law does not cause a child's educational program to become uncertain. IDEA expressly provides that, unless the parties otherwise agree, the child shall remain in his or her current placement during the pendency of review proceedings, or, if the child is applying for initial admission to a public school, the child shall be placed in the public school program. 20 U.S.C. § 1915(e)(3); *see also* State Plan, Section VI, at 36.

### B. The Instant Dispute

Jerry was born on August 19, 1983 and resides with his parents, the plaintiffs, in the Maryville School District. He is developmentally delayed. A summary of the multidisciplinary diagnostic tests performed in 1988 concluded that at age four years, eleven months, he "exhibits moderate to severe retardation with significant behavioral disturbances." Pls.' Ex. 20 at 2. A summary of

diagnostic tests performed in 1991, when Jerry was seven, reached the same conclusion. Defs.' Ex. 47 at 6. In practical terms, this means that Jerry, at age seven, did not vocalize except to make "cooing type of sounds (vowels)" and "screaming/laughing noises," *id.* at 2, 4; wore a diaper, *id.* at 4; and required verbal prompting to perform such tasks as getting a paper towel to dry his hands and throwing away, *id.* at 2, 5.

Based on the results of the 1988 diagnostic tests and Jerry's IEP, the State Schools determined that Jerry was eligible for education in the State Schools. The Maryville School District referred and re-referred Jerry to the State Schools for the 1988–89, 1989–90, and 1990–91 school years. During all three years, Jerry was placed in the State School at Maryville.

On November 1, 1990, a State School administrator wrote Dr. Tullberg, the Maryville superintendent, reminding him to conduct the three-year multidisciplinary diagnostic evaluation of Jerry. Pl.'s Ex. 10. These diagnostic tests were conducted in January and February 1991 and the results were sent to the DESE. *See* Pl.'s Exs. 12 & 13. In a letter dated March 13, 1991, the DESE advised Mr. Tullberg that, based on the results of those tests, Jerry continued to be eligible for State School services. Pl.'s Ex. 13. During trial, Cossey testified that this eligibility determination also was based on Jerry's IEP, educational records, and knowledge gained by the State Schools during the years Jerry had been placed there. Tr. at 33–34 (Cossey testimony).

In early March of 1991, the Hunts received a letter dated March 1, 1991 from Cossey relating that the State School in Maryville was being closed for budgetary reasons. Pl.'s Ex. 14. The letter further explains that students attending the State School in Maryville would be reassigned to a State School located in St. Joseph, Missouri for the 1991–92 school year. *Id.* Dr. Tullberg and the Maryville School District also received a copy of this letter.

Cossey's March 1, 1991 letter does not demonstrate, as plaintiffs suggest, that State

---

**5.** Parents also may waive the "administrative review" level and proceed directly to the "local

level hearing panel" stage. State Plan, Part VI, at 32.

School officials had decided Jerry's placement even prior to his April 1991 IEP conference or that a formal re-referral by the Maryville School District had been made. However, the March 1, 1991 letter leaves little doubt that State School officials had provisionally determined that if Jerry's IEP and the local school district supported re-referral, Jerry would be placed in the State School at St. Joseph. This view of Cossey's March 1, 1991 letter is confirmed by Cossey's explanation of his letter at trial. *See* Tr. 25–26 (Cossey testimony).

A round-trip bus ride between Maryville and St. Joseph is approximately ninety or one hundred miles. Mrs. Hunt was concerned about the effect this daily travel would have on Jerry's health and learning ability. On April 26, 1991, Mrs. Hunt attended Jerry's IEP meeting for the 1991–92 school year. Pls.' Statement of Facts & Issues of Law ¶ 31. The IEP conference also was attended by Kathleen Patterson Morrow, an "advocacy specialist" with Missouri Protection and Advocacy Services; the Maryville School District's director of special education services; Jerry's classroom teacher at the State School; and other State School officials and staff members. Def.'s Ex. 56 at 1.

At this IEP meeting, Mrs. Hunt and Ms. Patterson Morrow requested that Jerry be educated in the Maryville public schools rather than in the State School. According to Ms. Patterson Morrow's testimony, State School officials indicated that Jerry was too severely handicapped to be educated in the Maryville public schools, even in an "EMH classroom." [6] Mrs. Hunt testified that the "State people" indicated that they couldn't talk about educating Jerry in the Maryville public schools during the IEP meeting. The testimony of Ms. Patterson Morrow and Mrs. Hunt was uncontroverted by the State Defendants during trial. At the conclusion of the conference, the IEP Committee agreed on Jerry's educational goals and objectives, but "could not reach agreement regarding placement in a state school vs. a public

school." Def.'s Ex. 56 at 1; *see also* Tr. at 38 (Heskett testimony).

On May 22, 1991, the Maryville School District re-referred Jerry to the State Schools for the 1991–92 school year. Pls.' Statement of Facts & Issues of Law ¶ 34; Def.'s Ex. 98. Through counsel, the Hunts requested a due process hearing against the Maryville School District and the DESE on both the re-referral of Jerry to the State Schools and Jerry's "proposed placement" at the State School in St. Joseph. Pls.' Ex. 16.

In a letter dated May 28, 1991, Cossey denied the Hunts' request for a hearing against the DESE. Pls.' Ex. 49. Cossey advised the Hunts that the Maryville School District's "referral" of Jerry to the State Schools, and Jerry's "placement" in a particular State School, were separate issues. *Id.* Since, at that time, there had been only a referral by the Maryville School District, but no placement decision by the State Schools, the Hunts were entitled only to a hearing against the Maryville School District on the issue of whether Jerry's referral to the State Schools was appropriate. *Id.* Cossey advised the Hunts that they could not have a hearing against the DESE on the subject of where Jerry would be placed until the Maryville School District's referral decision had been reviewed by the hearing panel, upheld, and the DESE made its placement decision. *See id.*

Responding through counsel in a letter dated June 5, 1991, the Hunts against requested a hearing against the DESE. Pls.' Ex. 17 at 1. The Hunts stated that it was clear that the State Schools already had decided that Jerry would be placed in the State School at St. Joseph and that they were concerned that the bus ride to and from St. Joseph would be detrimental to Jerry. *Id.* at 1–2. The Hunts wanted to compare, in a single hearing, the effects of busing Jerry to and from St. Joseph with the type of education Jerry could receive in the Maryville School District. *Id.* at 2–3. The Hunts fur-

---

6. Evidently, "EMH" stands for "Educable Mentally Handicapped." The Maryville public schools apparently maintain an existing EMH classroom, which allows a small number of

handicapped children to be educated in a special classroom with the assistance of a teacher's aide. Pls.' Ex. 27, vol. I, at 100.

ther stated that, in their opinion, such a comparative hearing was necessary to comply with IDEA implementing regulations, which require public agencies to insure that a child's placement is as close as possible to the child's home and to consider the placement's potentially harmful effects on the child. *Id.* at 2 (citing 34 C.F.R. §§ 300.552(a)(3) & (c)). However, the DESE's division of the "referral" and "placement" issues precluded the Hunts from making this comparison: at the "referral" hearing against the local school district, they could address only the question of whether Jerry was eligible for education in the State Schools (*i.e.,* whether Jerry fell within the definition of "severely handicapped"); at the "placement" hearing against the DESE, they could not offer the local public school as an alternative to the State Schools since a referral would already have been made and accepted by the State Schools. *Id.* at 3.[7] The Hunts advised Cossey that, in their opinion, DESE's division of the referral and placement issues violated federal law. *Id.* at 1.

The Hunts participated in a due process hearing against the Maryville School District, but not the DESE (over the Hunts' objection), on July 11–12, 1991. Pls.' Statement of Facts & Issues of Law ¶ 40; *see also* Pls.' Ex. 27 vols. I and II (hearing transcript). The three-member panel heard thirteen witnesses and received 129 exhibits into evidence. *Id.* ¶ 41.

At the hearing, the Hunts sought review of both the referral and placement issues. Pls.' Ex. 1 at 2 (Hearing Decision). The Maryville School District contended that only Jerry's referral was at issue. *Id.* In its July 22, 1991 written decision, the hearing panel framed the issue as whether "the reassigning of the student from Maryville State School # 26 to the Helen M. Davis State School # 32 in St. Joseph ... constituted a change in placement, and if so, whether all of the requirements for procedural safeguards ...

were met by the State School for Severely Handicapped." *Id.* at 3. Finding that Jerry's IEP was revised after his placement had been changed to the State School in St. Joseph, the panel held that Jerry's assignment to the State School in St. Joseph was "clearly a change in educational placement and was not done in accordance with applicable Federal and State Laws and Regulations." *Id.* at 5. The panel recommended that Jerry undergo an independent evaluation and the development of a new IEP addressing, among other things, "[t]he student's specific needs in transportation to include length of ride ... and the potential detriments of an extended day which includes six hours of instruction coupled with an excessively long bus ride." *Id.* at 6–7.

The Maryville School District appealed the decision of the panel to the State Board of Education. On appeal, the Maryville School District argued that referral and placement are separate issues, and that the three-member panel erred in addressing Jerry's placement rather than considering only the narrow issue of Jerry's referral to the State Schools. *Id.* at 3. In his November 1, 1991 decision, the state level review officer rejected this argument, stating that "the State Plan [does not] mandate that a referral, which would necessarily result in an objectionable placement, be addressed without any consideration of that resulting placement," and that "If [the Hunts] believed placement was predetermined (which it in fact was, at least as to the school the child would attend, as correctly found by the panel), there was nothing restricting them from raising that concern in a referral determination...." *Id.* at 4 & 5 n. 3. The state level review officer also affirmed the decision of the three-member hearing panel, finding that Jerry's IEP did not address critical issues (such as the bus ride to and from St. Joseph) prior to his "effective reassignment" to the State School in St. Joseph. The state level review officer

---

7. The letter states:
Distance [of travel] cannot be reviewed at [the] referral [stage], since in the fictional way you divide this problem, we don't know where Jerry's placement will be. Under your theory, the only determination to be made at this level is whether the student can be defined as severely handicapped under the state plan. If referral is made, then at the "placement" hearing, under your theory, the parent cannot offer the public school as an alternative no matter how distant the state school is.
Pls.' Ex. 17 at 3.

also found that Jerry's April 26, 1991 IEP was developed after his placement had been changed. *Id.* at 7–9.

The administrative review process in this case never determined an appropriate educational placement for Jerry. Pursuant to IDEA's "stay put" provision, 20 U.S.C. § 1415(e), Jerry was educated in the Maryville School District during the pendency of the administrative proceedings and the early stages of this litigation. Pursuant to the March 18, 1992 consent decree, the Maryville School District has continued to educate Jerry.

### II. Discussion

#### A. Claims to be Addressed

Plaintiffs' claims are set forth in paragraph 50 of their second amended complaint by interlineation and paragraph 51 of their first amended complaint. As an initial matter, it is necessary to determine whether these claims are properly before the court.

In paragraph 50 of their second amended complaint by interlineation, plaintiffs allege that the State Defendants have violated federal law, including the provisions of IDEA, "[b]y failing ... to provide plaintiffs a procedure whereby a determination could have been or can be made of the appropriate educational placement for Jerry Hunt." Second Am. Compl. Interlineation ¶ 50. The claim that the State Defendants' procedures for referring and attempting to place Jerry in the State Schools violate federal law is properly before the court. It was the subject of the evidence adduced at trial and has been supported by the arguments advanced in plaintiffs' post-trial brief. Moreover, plaintiffs' procedural claim is the exclusive focus of the requests for relief set forth in their post-trial briefing. *See* Pls' Post–Trial Brief at 24–25.

State Defendants argue that plaintiffs' procedural claim has been rendered moot by the March 18, 1994 consent decree. Specifically, State Defendants contend that because the consent decree requires Jerry to be educated in the Maryville School District until at least the end of the 1994 school year, this case is moot because Jerry is not imminently at risk of being bused to the State School in St. Joseph.

The court rejects this argument. The target of plaintiffs' procedural claim is not the proposed bus ride, as State Defendants apparently believe, but the State Defendants' allegedly unlawful referral and placement procedures. In this litigation, the State Defendants have maintained steadfastly the legality of these procedures, including their policy of refusing to participate in a three-party due process hearing. The Maryville School District consistently has referred Jerry to the State Schools in the past and has only agreed to educate Jerry at a local school until the end of the 1994 school year. Given that Jerry's disability is severe and permanent, it is almost certain that the Maryville School District will attempt to re-refer Jerry to the State Schools in the immediate future, that the State Defendants will attempt to place Jerry in the State School in St. Joseph (the Maryville school having been closed), and that Jerry will be subjected to the same procedures which plaintiffs allege to be in violation of federal law.

Moreover, those procedures inflict "injuries" of an inherently limited duration. For instance, with respect to plaintiffs' claim that the State Defendants' refusal to participate in three-party hearings violates federal law, the alleged injury (denial of the parents' right to have a hearing against the local school district and the State Schools simultaneously) is complete as soon as the hearing is adjourned. Such injuries occur and are over so quickly that they will always be moot before they can be litigated in federal court.

In short, while the March 18, 1992 consent decree may have allayed temporarily the Hunts' concern that Jerry will be bused to the State School in St. Joseph, it has not obviated the legal question of whether the State Defendants' procedures comply with federal law. The record reveals both that there is a reasonable likelihood that Jerry will be subjected to the State Defendants' allegedly illegal procedures in the immediate future, and that those procedures inflict injuries of such limited duration that they never can be litigated satisfactorily in federal court. In these circumstances, the court finds that

plaintiffs' procedural claims are not moot because they are capable of repetition, yet evade judicial review. *See Honig,* 484 U.S. at 317–24, 108 S.Ct. at 601–04; *Jenkins v. Squillacote,* 935 F.2d 303, 306–08 (D.C.Cir. 1991). *See generally* Erwin Chemerinsky, *Federal Jurisdiction* § 2.5 at 109–24 (1989) (discussing mootness); Lawrence A. Tribe, *American Constitutional Law* § 3–11 at 82–93 (2d ed. 1988) (same). Accordingly, the court finds that the claims set forth in paragraph 50 of plaintiffs' second amended complaint by interlineation are justiciable and properly are before the court.

■ The claim set forth in paragraph 51 of plaintiffs' first amended complaint stands on a different footing. In paragraph 51, plaintiffs allege that defendants violated federal law, including IDEA, "[b]y attempting to ... bus Jerry Hunt to a segregated setting [*i.e.,* State School] approximately 110 miles a day." Pls.' First Am.Compl. ¶ 51. The thrust of this "bus ride" claim is uncertain. It may be directed at the State Defendants' referral and placement procedures. To that extent, it will be addressed when the court considers plaintiffs' procedural claim, set forth in paragraph 50 of their second amended complaint by interlineation. However, to the extent plaintiffs' seek a ruling on whether the lengthy bus ride itself violates federal law, their claim is not justiciable.

First, except to the extent it overlaps their procedural claim, the contention that the length of Jerry's potential bus ride to St. Joseph violates federal law was not the subject of the evidence adduced at trial. Nor has plaintiffs' "bus ride" claim been supported by argument in plaintiffs' post-trial briefing. Moreover, as noted above, the requests for relief set forth in plaintiffs' post-trial briefing focus exclusively on their procedural claim. It therefore appears that plaintiffs have abandoned their claim that the length of Jerry's potential bus ride to St. Joseph itself violates federal law.

Second, and more significantly, plaintiffs' "bus ride" claim does not appear to be ripe for review. Whether a claim is ripe depends on the " 'fitness of the issues for judicial decision' " and " 'the hardship to the parties of withholding court consideration.' " *Pacific*

*Gas & Elec. Co. v. State Energy Resources Conservation & Dev. Comm'n,* 461 U.S. 190, 199, 103 S.Ct. 1713, 1720, 75 L.Ed.2d 752 (1983) (quoting *Abbott Laboratories v. Gardner,* 387 U.S. 136, 149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967)); *see generally* Cherminsky, *supra,* § 2.4 at 98–109 (discussing the ripeness doctrine); Tribe, *supra,* § 3–10 at 77–82 (same). Unlike plaintiffs' procedural claim, which involves mainly legal issues, plaintiffs' "bus ride" claim is fact specific: the attempt to bus Jerry to St. Joseph may or may not comply with federal law, depending on the circumstances. Thus, to be " 'fit[ ] ... for judicial decision,' " *Pacific Gas,* 461 U.S. at 201, 103 S.Ct. at 1720 (quoting *Abbott Laboratories* ), plaintiffs' "bus ride" claim must be accompanied by an adequate record. However, the record in the instant case contains only minimal evidence, mainly in the record of the administrative proceedings, about how a daily bus ride to and from St. Joseph would affect Jerry's health and educational development. Absent a more complete development of this issue, which preferably would include medical testimony adduced at trial, the court is not in a position to determine whether busing Jerry to St. Joseph is inappropriate. Thus, in the circumstances of the instant case, Article III and prudential concerns weigh in favor of allowing the parties to develop the facts surrounding plaintiffs' "bus ride" claim in administrative proceedings (if those proceedings are necessary). While delaying review of plaintiffs' "bus ride" claim may impose some hardship on the parties, it is clear that a more developed factual record (as well as appropriate briefing submitted by counsel) is essential for that claim to be reviewed effectively.

Accordingly, the court finds that plaintiffs' "bus ride" claim, which is set forth in paragraph 51 of plaintiffs' first amended complaint, is not justiciable because it has been abandoned by the plaintiffs in their post-trial requests for relief and because it is not ripe for review.

*B. Analysis: Plaintiffs' Procedural Claim*

The court now turns to its analysis of plaintiffs' procedural claim, plead in para-

graph 51 of plaintiffs' second amended complaint by interlineation. It is difficult to discern the precise nature of this claim from the face of paragraph 51 itself, which is drafted in broad language. Thus, the components of plaintiffs' procedural are best understood by using the requests for relief set forth in plaintiffs' post-trial brief as a guide. *See* Pls.' Post–Trial Brief at 24–25.

### 1. Hearing Rights

In their post-trial brief, plaintiffs request the court to declare unlawful and enjoin the State Defendants' practice of "fail[ing] to grant a hearing when requested by a parent to address the issue of referral to, eligibility for, or placement in the State Schools." Pls. Post–Trial Brief at 25. This broad request is related to an additional, more specific request that the court declare unlawful and enjoin the State Defendants' practice of "fail[ing] to participate in a three-party hearing with the parents and local school district, when requested by the parents to address the issue of referral to, eligibility for, or placement in the State Schools." *Id.*

In the instant case, the evidence establishes that, by March 1, 1991, the State Schools had determined that Jerry would be placed in the State School at St. Joseph if Jerry's IEP and the local school district supported re-referral. *See* Pls.' Ex. 14; Tr. at 25–26. Shortly thereafter, on March 13, 1994, the State Schools determined that Jerry was eligible for continued service in the State Schools. Jerry's IEP meeting took place on April 26, 1991. The uncontroverted testimony of Mrs. Hunt and Ms. Patterson Morrow establishes that, during the IEP meeting, State School officials indicated that Jerry could not be educated in the Maryville public schools, even in an EMH classroom, and would not discuss educating Jerry in the Maryville schools. Not surprisingly, the IEP committee, except for Mrs. Hunt, recommended continuing Jerry's placement in the State Schools.[8] The Hunts requested a three-party due process hearing on May 21, 1991. The next day, on May 22, the Mary-

ville School District officially re-referred Jerry to the State Schools.

The foregoing evidence establishes that, by the time the Hunts requested a three-party due process hearing on May 21, 1991, the decision to re-refer Jerry to the State Schools and to place him at the State School in St. Joseph effectively had been made. This view of the evidence is consistent with the conclusions of the three-member due process hearing panel and state level review officer, who found that Jerry had been assigned to the State School in St. Joseph and that, at the time of re-referral, Jerry's placement in St. Joseph was "predetermined, at least as to the school [Jerry] would attend." Pls.'s Ex. 28 at 4–5 n. 3 (decision of the state level review officer); Pls.' Ex. 17 (hearing panel decision) ("It is the panel's unanimous decision that the closing of Maryville State School # 26 and the assignment of the student to Helen Davis State School # 32 [in St. Joseph] was clearly a change in educational placement. . . .").

The evidence further establishes that, in spite of the fact that State School officials effectively had decided that Jerry would be placed at the State School in St. Joseph, and actually recommended that Jerry be placed in the State Schools in Jerry's IEP, the State Schools advised the Hunts that they could only have a hearing against the Maryville School District on the issue of Jerry's referral. *See* Pls.' Ex. 49.

The State Defendants argue they had no obligation to participate in a three-party hearing with the Hunts. The State Defendants point out that, under the State Plan, Jerry's placement in the State Schools would not become an issue until Jerry's referral had been upheld in administrative due process proceedings. Thus, according to the State Defendants, the Hunts' request for a hearing on the placement issue was premature. *See* State Defs.' Post–Trial Brief at 7–11. In addition, the State Defendants appear to argue that the State Plan's bifurcated hearing procedure is designed to insure compliance with IDEA's "least restrictive envi-

---

8. It is unclear whether Ms. Patterson Morrow was a member of Jerry's IEP committee in April 1991.

ronment" requirement. *See id.* § 1412(5)(B). According to the State Defendants, the purpose of the referral due process proceedings was to require the Maryville School District to prove that it was incapable of educating Jerry in a local placement. Thus, the State Defendants argue, until the Maryville School District could prove that it did not have the capacity to implement Jerry's IEP in a local program, issues pertaining to Jerry's potential placement in St. Joseph (*e.g.*, length and effects of bus ride) were irrelevant. *See id.* at 12–13 ("To be consistent with IDEA, the responsibility to provide educational services for Jerry Hunt needed to remain focused exclusively on [the] Maryville [School District] unless and until it established to the satisfaction of the hearing panel that the school district, with the use of supplemental aids and services, could not provide Jerry Hunt with a free appropriate public education.")

These arguments explain how the State Defendants' view their obligations under the State Plan and how the State Plan's bifurcated hearing procedure is intended to insure compliance with IDEA's "least restrictive environment" requirement. However, these arguments ignore the question of whether the State Plan's bifurcated hearing procedure complies, not with IDEA's least restrictive environment requirement, but with IDEA's hearing provisions.

■ Under IDEA, states must provide parents "an opportunity to present complaints with respect to any matter relating to the ... educational placement of the child," 20 U.S.C. § 1415(b)(1)(E), through "an impartial due process hearing," *id.* § 1415(b)(2); *see also* 34 C.F.R. § 300.506(a); *id.* § 300.403(a). In the instant case, the court finds that once State School officials had made a provisional determination that Jerry would be placed in the State School at St. Joseph, determined that he was eligible for continued service in the State Schools, took the position during the IEP conference that Jerry could not be educated in the Maryville School District, and recommended in Jerry's IEP that Jerry be placed in the State Schools, the Hunts had the right under 20 U.S.C. § 1415(b)(1)(E) & (2) to have an impartial due process hearing against the State Schools on any issue pertaining to Jerry's placement. By refusing to participate in such a hearing, the State Defendants violated IDEA's hearing provisions, 28 U.S.C. § 1415(b)(1)(E) & (2).

In the instant case, making a distinction between "referral" and "placement," as the State Defendants do, is illogical. Since Jerry's re-referral raised the possibility that Jerry would be placed in the State School at St. Joseph, Jerry's re-referral necessarily implicated issues pertaining to his placement. Moreover, in substance, the Maryville School District's re-referral of Jerry to the State Schools *was* a placement decision. Like the Hunts, the Maryville School District had been notified that if it re-referred Jerry to the State Schools, Jerry would be placed in the State School at St. Joseph. Thus, the Maryville School District's re-referral of Jerry to the State Schools constituted a determination that placing Jerry in the State School at St. Joseph was superior to any possible educational placement the local district could provide.

By requesting a three-party due process hearing, the Hunts wanted to address that determination by allowing the due process hearing panel to compare the benefits and drawbacks of educating Jerry in a local placement with the benefits and drawbacks of Jerry's predetermined State School placement in St. Joseph. To the Hunts, making this comparison at the same time the hearing panel considered whether Jerry could be educated in a local placement was imperative: under the terms of the State Plan, if Jerry's re-referral to the State Schools was upheld, DESE would only be able to place Jerry in a State School, a not-for-profit agency, or provide him with homebound instruction. State Plan, App. B, at B–4. Placement in a local school program no longer would have been an option. The argument that the Hunts could have had a hearing on the length and effect of Jerry's bus ride at a later time is unpersuasive because it fails to recognize this fact. Moreover, in the instant case, it makes little sense to require the Hunts to exhaust two hearings on the single question of where Jerry should attend school.

Both IDEA and case law recognize the importance of making comparisons among different placement alternatives. The courts have held that, in determining whether IDEA's least restrictive environment mandate has been satisfied, the costs and benefits of alternative educational placements should be compared. *Greer v. Rome City Sch. Dist.*, 950 F.2d 688, 697 (11th Cir.1991) (stating that, in determining whether education in a regular classroom may be achieved satisfactorily, school districts may compare the benefits the child will receive in each alternative placement), *opinion withdrawn on other grounds*, 956 F.2d 1025 (11th Cir.), *and reinstated*, 967 F.2d 470 (11th Cir.1992); *A.W. v. Northwest R–1 Sch. Dist.*, 813 F.2d 158, 162 (8th Cir.) (stating that, in determining whether educating a child in a segregated setting is permissible, courts may compare the cost of a particular placement to the local school district with the benefits the placement will give the child), *cert. denied*, 484 U.S. 847, 108 S.Ct. 144, 98 L.Ed.2d 100 (1987). In addition, IDEA requires public agencies to insure that each child's placement "[i]s as close as possible" to the child's home, [34] C.F.R. § 300.552(a)(3), and that, in selecting the least restrictive environment for the child, "consideration is given to any potential harmful effect on the child," *id.* § 300.552(d). By refusing to participate in a three-party hearing in the instant case, the State Defendants deprived the hearing panel of evidence pertaining to Jerry's potential placement in the State School at St. Joseph. By doing so, the State Defendants precluded the Hunts from presenting a complaint pertaining to Jerry's placement in an impartial due process hearing, from obtaining a comparison of the range of alternative placements that potentially were available to Jerry, and from obtaining effective review of IDEA's "closest to home" and "harmful effects" requirements.

Congress deemed IDEA's hearing provisions and other procedural safeguards an important tool in assuring handicapped children an appropriate education and protecting them from erroneous and arbitrary decisions affecting their education. *See Daniel R.R. v. State Bd. of Educ.*, 874 F.2d 1036, 1041 (5th Cir.1989) ("The Act's procedural guarantees

are not mere procedural hoops.... Rather, 'the formality of the Act's procedures is itself a safeguard against arbitrary and erroneous decisionmaking.'") (quoting *Jackson v. Franklin County Sch. Bd.*, 806 F.2d 623, 630 (5th Cir.1986)); *see also Honig*, 484 U.S. at 330, 108 S.Ct. at 608 (noting that IDEA's procedural safeguards are part of a legislative scheme to provide parents "both an opportunity for meaningful input into all decisions affecting their child's education and the right to seek review of any decisions they think inappropriate."); *Board of Educ. of the Hendrick Hudson Sch. Dist. v. Rowley*, 458 U.S. 176, 204, 102 S.Ct. 3034, 3050, 73 L.Ed.2d 690 (1982) ("Congress placed every bit as much emphasis upon compliance with procedures giving parents and guardians a large measure of participation at every stage of the administrative process, *see, e.g.,* §§ 1415(a)–(d), as it did upon the measurement of the resulting IEP against a substantive standard."). Requiring the State Defendants to participate in a due process hearing comparing the benefits and drawbacks of a predetermined State School placement with those of any potentially suitable local placements is consistent with IDEA's legislative scheme. By contrast, refusing to participate in a due process hearing requested by the parents, and attempting to fragment the issues surrounding a child's education, run counter to the legislative purpose underlying IDEA's procedural safeguards.

The court limits its ruling to the facts before it. When a post-referral placement determination has not been made, it may well facilitate IDEA's goals for the State Defendants to limit the initial hearing to the question of whether a local school district has the capacity to implement a child's IEP. However, when State School officials have recommended that a child be referred to the State Schools and have determined and given notice of what the child's post-referral placement will be, and that placement raises questions which, for proper review, require a comparison between the predetermined State School placement and potentially suitable local placements, the issues of "referral" and "placement" become intertwined. In those circumstances, 20 U.S.C. § 1415(b)(1)(E) and

(2) obligate the State Schools, at the parents' request, to participate in a prompt, single due process hearing.

 Accordingly, the court finds that the State Defendants' refusal to participate in a three-party hearing to compare Jerry's predetermined placement at the State School in St. Joseph with potentially suitable placements in the Maryville School District violated IDEA by denying the Hunts the right to present a complaint and have an impartial due process hearing with respect to "any matter relating to the ... educational placement" of their son. In addition, the court finds that plaintiffs are the intended beneficiaries of 20 U.S.C. § 1415(b)(1)(E) and (2); that those provisions created a binding obligation on the state to participate in a hearing with the Hunts; and that the right to a hearing under IDEA is sufficiently specific to be capable of enforcement. Therefore, the court finds that, by refusing to participate in a three-party hearing, the State Defendants' deprived the Hunts of a "federal right" and therefore violated 42 U.S.C. § 1983. *See Arkansas Medical Society v. Reynolds,* 6 F.3d 519, 525–28 (8th Cir.1993) (setting forth the test for determining whether a federal statute creates a right enforceable through 42 U.S.C. § 1983).

The State Defendants are permanently enjoined from engaging in that practice in the future and are directed to develop and implement new procedures that comply with IDEA.

Since the court's analysis of plaintiffs' claim under IDEA and § 1983 is dispositive of this issue, the court declines to render an advisory opinion on the question of whether the State Defendants' procedures violate other federal laws or the fourteenth amendment to the Constitution.

### 2. *Eligibility and Referral Procedures*

In their post-trial brief, plaintiffs make several requests for relief with respect to the State Defendants' eligibility and referral procedures. Specifically, plaintiffs request the court to declare unlawful and enjoin the State Defendants from:

(1) "[F]ail[ing] to clearly and expressly require local school districts, before referring a child to the State Schools, to consider [least restrictive environment] requirements in an IEP meeting with parents";

(2) "[F]ail[ing] to require local school districts to document their consideration of educating the child in the local school district and to identify the supplemental aids and services that a child would need to be satisfactorily educated there";

(3) "[F]ail[ing] to require local school districts to articulate the reasons why they are unable to provide a program in which the child could benefit or meaningfully participate;"

(4) "[F]ail[ing] to make an independent review at the State level of the local school district's consideration of the least restrictive environment, before informing the local district that a child is eligible for State School placement"; and

(5) "[F]ail[ing] to make an independent determination at the State level that a local school district is unable to provide an educational program in which a child could benefit or meaningful [sic] participate, before informing the local district that a child is eligible for State School placement."

Pls.' Post–Trial Brief at 24. Plaintiffs allege that these individual practices fail to insure that children will be placed in the least restrictive environment, as required by IDEA.

As an initial matter, the court notes that it has had some difficulty construing these requests for relief. As noted above, the process for placing a child in the State Schools has several stages: initial evaluation and IEP development, the eligibility determination, referral, and placement. Plaintiffs' first request for relief clearly relates to the referral stage of this process. *See id.* (requesting the court to declare unlawful and enjoin the State Defendants' failure to "expressly require local school district, before *referring* a child to the State Schools, to consider [least restrictive environments] in an IEP meeting with parents") (emphasis added). Plaintiffs' fourth and fifth requests for relief expressly relate to the eligibility determination stage. Plaintiffs' second and third requests, however, do not specifically identify the stage to

which they relate. Based on the ·testimony elicited by plaintiffs' counsel during trial, and inferences drawn from the authorities cited in plaintiffs' pre- and post-trial briefs, the court assumes these requests for relief relate to the eligibility determination stage, and will analyze those claims accordingly.

### (a) The "Least Restrictive Environment Requirement"

By alleging violations of IDEA's least restrictive environment requirement, plaintiffs have touched on the heart of IDEA. The enactment of IDEA (formerly the EHA) was motivated by a congressional finding that more than half of the eight million handicapped children in the United States were not receiving appropriate educational services, 20 U.S.C. § 1400(b)(1) & (3), and that one out of every eight was excluded from the public school system altogether, *id.* at § 1400(b)(4). To remedy this situation, IDEA requires participating states to file a state plan establishing:

> [P]rocedures to assure that, to the maximum extent appropriate, handicapped children ... are educated with children who are not handicapped, and that special classes, separate schooling, or other removal of handicapped children from the regular educational environment occurs only when the nature or severity of the handicap is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

*Id.* § 1412(5)(B).

The courts uniformly have interpreted IDEA's "mainstreaming" or "least restrictive environment" requirement as indicating a strong statutory preference for educating handicapped children with nonhandicapped children. *E.g., Greer,* 950 F.2d at 695; *A.W. v. Northwest R–1 Sch. Dist.,* 813 F.2d at 162. IDEA's accompanying regulations implement the least restrictive environment mandate by requiring IEP committees to determine and include in the IEP "the specific special education and related services to be provided," 34 C.F.R. § 300.346(a)(3), by requiring placements to be based on the child's IEP, *id.* § 300.552(a)(3), and by requiring that a continuum of alternative placements be made available, *id.* §§ 300.551, 300.552(b). In addition, pursuant to 20 U.S.C. § 1412(6), ultimate responsibility for assuring compliance with IDEA's least restrictive environment mandate rests with the state educational agency. 20 U.S.C. § 1412(6); *see also id.* § 1414(d)(3) (allowing a state educational agency to provide direct special education services to children if the State educational agency "determines that a local educational agency ... (3) has one or more handicapped children who can best be served by a regional or State center designed to meet the needs of such children").

### (b) Referral Procedures

■ Plaintiffs contend that the State Defendants' referral and re-referral procedures violate IDEA by "fail[ing] to clearly and expressly require (sic) local school districts, before referring a child to the State Schools, to consider [least restrictive environment] requirements in an IEP meeting with parents." Pls.' Post–Trial Brief at 24.

In the instant case, the evidence, and Heskett's testimony in particular, indicates that under the current State Plan, the referral stage is the critical point at which IDEA's least restrictive environment requirement is given effect. Upon receiving notification that a child is eligible for service in the State Schools, the local school district is supposed to consider the range of alternative placements, treat the State Schools as an option, and make a decision as to the child's placement. Tr. at 65–69 (Heskett testimony). It is at this stage that the local school district is supposed to consider whether supplementary aids or services could be used to implement the child's IEP in a local school program. *Id.* at 68–70, 82.

IDEA and its regulations require educators to consider alternative placements and the use of supplementary aids and services prior to placing a child in a particular educational program. *See* 20 U.S.C. § 1412(5)(B) (requiring the establishment of procedures to assure that handicapped children are not removed from regular educational environments unless "education in regular classes with the use of supplementa-

ry aids and services cannot be achieved satisfactorily)."; 34 C.F.R. § 300.550 (requiring state educational agencies to ensure that local agencies ensure that handicapped children are placed in the least restrictive environment); *id.* § 300.551, 300.552 (requiring public agencies to maintain a continuum of alternative placements); *Greer*, 950 F.2d at 696 ("[B]efore the school district may conclude that a handicapped child should be educated outside the regular classroom, it must consider whether supplemental aids and services would permit satisfactory education in the regular classrooms. The school district must consider the whole range of supplemental aids and services....").

However, the evidence in the instant case reveals that, Heskett's testimony notwithstanding, the State Plan does not explicitly instruct local school districts that prior to referring or re-referring a child to the State Schools, the local school district must consider the range of available placements and whether supplementary aids or services could be used to implement the child's IEP in a local school program. *See* State Plan, App. B, at B–4 & 5. In addition, the evidence demonstrates that the State Plan does not expressly designate who makes the decision to refer or re-refer a child to the State Schools, *id.*, and that it is unclear in the instant case whether the decision to refer and re-refer Jerry to the State Schools was made by the IEP committee or the multidisciplinary diagnostic team. The evidence additionally demonstrates that if multidisciplinary diagnostic teams make referral decisions, it is almost a certainty that parents would not be involved in that decision.

In view of this evidence, the court finds that the provisions of the State Plan governing the referral and re-referral of children to the State Schools are inconsistent with IDEA. As noted above, the decision to refer or re-refer a child constitutes a placement decision: by referring a child to the State Schools, the local school district is making a determination that it cannot implement the child's IEP in a local placement and that placement in the State Schools therefore is necessary. By failing to specify precisely who makes referral and re-referral decisions,

and by failing to explicitly instruct local school districts that, prior to referral or re-referral, they must consider whether a child could be educated in an alternative local placement with the use of supplementary aids and services, the State Plan opens the door to erroneous and arbitrary placement decisions and falls short of IDEA's requirement that the state "establish[ ] procedures" to assure that ... "[the] removal of handicapped children from the regular educational environment occurs only when ... education in regular classes with supplementary aids and services cannot be achieved satisfactorily." 20 U.S.C. § 1412(5)(B); *see also* 34 C.F.R. § 300.550 (requiring public agencies to ensure that children are placed in the least restrictive environment).

Moreover, in view of the fact that local school districts are required to consider the use of supplementary aids and services during the development of a child's IEP, *Greer*, 950 F.2d at 696, IDEA's requirement that IEPs form the basis for placement decisions, 34 C.F.R. § 300.552(a)(3), and that Congress intended IDEA to give parents an opportunity to "provide meaningful input into all decisions affecting their child's education," *Honig*, 484 U.S. at 311, 108 S.Ct. at 598, and "a large measure of participation at every stage of the administrative process," *Rowley*, 458 U.S. at 205, 102 S.Ct. at 3050, it is clear that local school districts must make the decision to refer or re-refer a child to the State Schools in an IEP meeting with parents, if the child's parents choose to participate.

The court's ruling on this issue only requires the State Defendants to formalize in the State Plan the referral and re-referral procedures that, according to Heskett's testimony, the State Defendants already intend local school districts to follow. *See* Tr. at 65–70, 82 (Heskett testimony). Until those procedures are explicitly made a part of the State Plan, however, the State Plan is inconsistent with the IDEA's least restrictive environment requirement and violates the provisions of that Act.

■ Accordingly, the court finds that the failure of the State Defendants to require expressly that local school districts consider IDEA's least restrictive environment re-

**248**

quirement in an IEP meeting with parents prior to referring or re-referring a child to the State Schools violates IDEA's requirement that the state establish "procedures to assure that ... [the] removal of handicapped children from the regular educational environment occurs only when ... education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." 20 U.S.C. § 1412(5)(B). However, the court finds that because the statutory language relied upon by plaintiffs does not unambiguously confer the "right" they have asserted in this context, plaintiffs' referral claim is not enforceable pursuant to 42 U.S.C. § 1983. *See Arkansas Medical Society, Inc.*, 6 F.3d at 527–28.

The State Defendants are permanently enjoined from engaging in that practice in the future and are directed to develop and implement procedures that comply with IDEA.

Since the court's analysis of plaintiffs' claim under IDEA is dispositive of this issue, the court declines to render an advisory opinion on the question of whether the State Defendants' procedures violate other federal laws or the fourteenth amendment to the Constitution.

*(c) Eligibility Determination Procedures*

■ Plaintiffs' second, third, fourth, and fifth requests for relief allege that the State Defendants' procedures for determining whether a child is eligible for service in the State Schools violate IDEA. In particular, plaintiffs seek a declaration that the State Defendants' current procedures violate IDEA because they do not require local school districts to document their consideration of educating a child in a local placement, identify the supplementary aids and services that would be necessary to educate the child in a local placement, or articulate the reasons why the local district is unable to provide a placement that would benefit the child or in which the child could meaningfully participate. Pls.' Post–Trial Brief at 24. In a related claim, plaintiffs contend that the State Defendants also violate IDEA because,

prior to notifying a local school district that a child is eligible for the State Schools, the State Defendants' current procedures do not provide for an independent state-level review of the local school district's consideration of the least restrictive environment requirement or the local district's determination that it is unable to provide a program in which a child could benefit or meaningfully participate. *Id.*

IDEA's least restrictive environment requirement obligates states to establish procedures to "assure that ... [the] removal of handicapped children from the regular educational environment occurs only when ... education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." 20 U.S.C. § 1412(5)(B). In the instant case, the evidence indicates that Missouri implements this federal mandate, in part, through its statutory definition of "severely handicapped." *See* Mo.Ann.Stat. § 162.675(3). For a child to be eligible for service in the State Schools, Mo.Ann.Stat. § 162.675(3) requires a determination that the child is "unable to benefit from or meaningfully participate in" local school district programs.[9] *Id.; see* Tr. at 9 (Cossey testimony); Tr. at 61 (Heskett testimony). While this eligibility requirement is imposed by Missouri's state-law definition of "severely handicapped," rather than by federal law, it nevertheless is closely tied to IDEA's least restrictive environment requirement since the stringency of the statutory language prohibits children from being placed in the State Schools unless the child would gain so little from a regular educational environment that placement in the State Schools is a necessity.

The State Plan delegates to the State Schools the responsibility of determining whether a particular child is eligible for service in the State Schools. State Plan, App. B, at B–3 through B–4. The eligibility determination made by the State Schools is an important juncture in the implementation of IDEA's least restrictive environment requirement since, in the instant case, the evi-

---

9. To be eligible for the State Schools, the child also must be functioning at levels of development that are one-half or less those of his or her peers.

State Plan, App. B., at B–1. Plaintiffs do not challenge the State Schools' procedures for reviewing this half of the eligibility requirement.

dence revealed that once the State Schools notify a local school district that a child is eligible for service in the State Schools (*i.e.,* that the child is "unable to benefit from or meaningfully participate in" a local program), there is a risk that the local school district will refer and re-refer the child to the State Schools without properly considering whether the child could be educated in a local placement. For instance, during the administrative due process hearing, the Maryville School District's director of special education services testified that since Jerry met the guidelines for State School placement and had been accepted by the State Schools, and the Hunts did not object, the local school district did not discuss the possibility of educating Jerry in a local placement.[10] The evidence further reveals a surprising lack of documentation to show that, prior to referring and re-referring Jerry to the State Schools, the Maryville School District considered in any detail whether Jerry could be educated in a local placement with the use of supplementary aids or services.[11]

The very real possibility that local school districts will not seriously consider whether a child could be educated in a local placement with the use of supplementary aids and ser-

vices prior to making referrals or re-referrals to the State Schools highlights the importance of the State Schools' eligibility determination, and makes that stage in the State Plan's referral and placement process a significant safeguard against inappropriate referrals to the State Schools. That the State Schools should perform this "gate-keeping" function is appropriate since 20 U.S.C. § 1412(6) places the ultimate responsibility for assuring compliance with IDEA's provisions on state educational agencies.

However, in spite of the crucial role the State Plan assigns to the State Schools in implementing IDEA's least restrictive environment requirement, the record demonstrates that the State Schools do not independently examine whether a particular child is unable to "benefit from or meaningfully participate in" a local placement until thirty days *after* the child has been placed in the State Schools.[12] Instead, the State Schools openly rely on local IEP committees to make that determination. Tr. at 14–17, 20 (Cossey testimony); Tr. at 61–62 (Heskett testimony). The State Schools do not require local school districts to document or articulate specifically why the child is unable to "benefit from or meaningfully participate in" local

---

**10.** During the due process hearing, the following exchange took place between plaintiffs' counsel and the Maryville School District's director of special education services:

> Q: What have you tried in terms of what can we do for Jerry to bring him here [to the Maryville School District]? Have you tried anything?
> A: Not specifically.
> Q: Just no?
> A: The request [to educate Jerry locally] had not been made once he was accepted by the state school. And the parent had not issued any objection. And he fit the state guidelines at that point. So no, we had not, you know, we had not discussed [educating Jerry in a local placement].

Pls.' Ex. 27, vol. II, at 383.

**11.** The only evidence which demonstrates that the Maryville School District considered whether Jerry could be educated in a local placement appears in conclusory statements set forth in Jerry's IEPs, the Letters of Referral signed by Dr. Tullberg, and the reports of the multidisciplinary diagnostic team. *See, e.g.,* Defs.' Ex. 98 (Letter of Referral) (certifying that "placement alternatives associated with local school district ...

educational programming have been considered by the multi-disciplinary diagnostic team and rejected."); Defs.' Ex. 38 (1990–91 IEP for Jerry Hunt) (stating: "Due to student's level of progress and viewing of diagnostic information, IEP committee recommends placement in State Schools for Severely Handicapped."); Defs.' Ex. 81 at 1 (1989–90 IEP for Jerry Hunt) (stating: "Having reviewed the most recent diagnostic information, the needs cited in the IEP, school performance, and socialization skills[,] and having discussed placement alternatives, the IEP committee recommends that placement in the [State Schools] is the least restrictive environment for Jerry W. Hunt at this time."); Pls.' Ex. 12 at 6 (stating: "Based upon the data collected and previous information reviewed, the diagnostic team determines that Jerry Hunt's needs can best be served with continued placement in the State School[s].").

**12.** In response to a question from the court, Heskett testified that the first point at which the State Schools are able to consider whether the State Schools or a local placement represent the least restrictive environment for a child is during the IEP committee meeting that is held thirty days after the child has been placed in the State Schools. Tr. at 83 (Heskett testimony).

school district programs. Tr. at 14–17 (Cossey testimony). Nor do the State Schools require local districts to describe what special education services the local district has in place. *Id.* Instead, the State Schools rely largely on the IEP and diagnostic information submitted by local school districts. *See* State Plan, App. B, at B–3.

However, as noted above, Jerry's IEPs and diagnostic information contain only conclusory statements indicating that the Maryville School District considered whether Jerry could "meaningfully benefit from or participate in" local placements with the use of supplementary aids and services. Thus, unless the IEP or diagnostic information raise patent "red flags," *see* Tr. at 62, 64–65, the State Schools have no way of knowing whether a child could "benefit from or meaningfully participate in" a local placement with the use of supplementary aids and services until thirty days after the child has been placed in the State Schools.

By allowing local school districts to determine whether a child could "benefit from or meaningfully participate in" a local placement, without proper state-level review, the State Defendants' current procedures violate IDEA, 20 U.S.C. § 1412(5)(B), because they fail to assure that children are educated in the least restrictive environment. 20 U.S.C. § 1412(5)(B). To prevent inappropriate referrals to the State Schools, the State Schools should, at a minimum, withhold making a decision on a child's eligibility for service in the State Schools (*i.e.,* determining that the child cannot "benefit from or meaningfully participate in" a local placement) until the local school district is able to document in a meaningful way that it has examined the child's needs, considered what supplementary aids and services would be necessary to meet those needs, and come to the informed conclusion that the child's IEP cannot be implemented in a local placement.

During his testimony, Cossey pointed out that while the State Schools largely have assigned the duty of determining whether a child could "benefit from or meaningfully participate in" a local placement to local IEP committees, the State Plan gives parents the right to contest the local district's determination in a due process hearing. *See* Tr. at 20 (Cossey testimony). However, this argument ignores the fact that the State Plan assigns the responsibility for making eligibility determinations to the State Schools, not local school districts, *see* State Plan, App. B, at B–3 through B–4, and that state educational agencies ultimately are responsible for assuring that IDEA's least restrictive environment requirement is carried out. In addition, contending that it is harmless to delegate the determination of whether a child could "benefit from or meaningfully participate in" a local placement to local school districts because due process hearings will correct any erroneous decision tends to put the cart before the horse. If the State Schools required local school districts to document their conclusion that a child could not be educated satisfactorily in a local placement, and conducted an independent state-level review of that conclusion, erroneous local decisions could be corrected before it became necessary for parents to expend the time and resources that are incidental to the initiation of due process hearings.

Finally, in their brief, the State Defendants argue that they assure compliance with IDEA's least restrictive environment mandate by requiring local school districts to submit an annual compliance plan, *see* State Plan, App. A, and by subjecting local school districts to comprehensive monitoring, *see id.,* Part VII, at 50. State Defs.' Post–Trial Brief at 13–17. However, it is impossible to conclude that the State Defendants' annual compliance plan requirement and monitoring policies are sufficient to overcome the shortcomings discussed above. In part, this conclusion is based on a lack of reliable proof: the State Defendants have not introduced the Maryville School District's annual compliance plan in evidence, the exhibit setting forth the State Defendants' detailed monitoring standards is stamped "DRAFT" in bold letters, *see* Defs.' Ex. 101, and the testimony at trial did not touch upon either the annual compliance plan requirement or the State Defendants' comprehensive monitoring policy. More important, however, is the observation that while the State Defendants' compliance plan requirement and monitoring activities

may help assure that local school districts generally comply with IDEA's least restrictive environment requirement, the evidence in the specific case of Jerry Hunt indicates that when the local school district was notified that Jerry was eligible for the State Schools, it began to assume simply that Jerry could not be educated in a local placement. This conclusion is supported, in part, by the lack of documentary evidence demonstrating that the Maryville School District gave any consideration to whether Jerry's IEP could be implemented in a local placement.

Accordingly, the court finds that the State Defendants' current procedures for making eligibility determinations violate IDEA's requirement that the State establish "procedures to assure that ... [the] removal of handicapped children from the regular educational environment occurs only when ... education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." 20 U.S.C. § 1412(5)(B). In particular, the court finds that the State Defendants' eligibility determination procedures violate IDEA because, prior to notifying a local school district that a particular child is eligible for service in the State Schools, the State Defendants' procedures: (1) fail to require local school districts to document their consideration of educating the child in a local placement and to identify the supplemental aids and services that a child would require to be educated in a local placement; (2) fail to require local school districts to articulate the reason(s) why they are unable to provide a local placement that would benefit the child or in which the child could meaningfully participate; and (3) by virtue of the foregoing failings, the State Defendants fail to review independently the local school district's consideration of IDEA's least restrictive environment requirement and the local school district's decision that it cannot satisfactorily educate the child in a local placement.

■ However, the court finds that because the statutory language relied upon by plaintiffs does not unambiguously confer the "rights" they have asserted in this context, plaintiffs' "eligibility determination" claim is not enforceable pursuant to 42 U.S.C. § 1983. *See Arkansas Medical Society, Inc.,* 6 F.3d at 527–28.

The State Defendants are permanently enjoined from engaging in these practices in the future and are directed to develop new procedures which comply with IDEA.

Since the court's analysis of plaintiffs' claim under IDEA and § 1983 is dispositive of this issue, the court declines to render an advisory opinion on the question of whether the State Defendants' procedures violate other federal laws or the fourteenth amendment to the Constitution.

## III. Conclusion

This Court is reluctant to add to the federal intrusion into matters clearly of state concern. Elementary and secondary education are such matters of state concern. However, the unfortunate political and legal reality is that when the state accepted federal money, it became obliged to allow certain federal intrusion. 20 U.S.C. §§ 1412, 1415.

For the reasons set forth above, it is

ORDERED that the State Defendants are enjoined permanently from failing to participate in a three-party hearing with parents and local school districts when, prior to the referral or re-referral of a child to the State Schools for the Severely Handicapped by a local school district, the State Defendants or their agents have recommended that the child be placed in the State Schools and determined which State School the child will attend, and the child's parents request a three-party hearing to compare the benefits and drawbacks of the predetermined State School placement with those entailed by any potentially suitable educational placements provided by the local school district. It is further

ORDERED that the State Defendants are permanently enjoined from failing to require expressly that local school districts consider the least restrictive environment requirement established by the Individuals with Disabilities in Education Act in an Individualized Education Program meeting with a child's

parents prior to referring or re-referring the child to the State Schools for the Severely Handicapped. It is further

ORDERED that the State Defendants are permanently enjoined from notifying a local school district that a child is eligible for the State Schools for the Severely Handicapped without requiring the local school district to (1) document its consideration of the possibility of educating the child in potentially suitable educational placements provided by the local school district; (2) identify the supplementary aids and services the child would require to be educated in those potentially suitable local educational placements; (3) articulate the reasons why the local school district cannot provide the child with a local educational placement which would benefit the child or in which the child could meaningfully participate. In addition, the State Defendants are permanently enjoined from notifying a local school district that a child is eligible for the State Schools for the Severely Handicapped without conducting an independent review, based on the materials discussed above, of the local school district's consideration of the least restrictive environment requirement established by the Individuals with Disabilities in Education Act and the local school district's conclusion that it cannot provide the child with a satisfactory local placement. It is further

ORDERED that the State Defendants shall develop and implement procedures that remedy the above-listed defects in their procedures and which comply with the Individuals with Disabilities in Education Act.